UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| AIESHA S. STEWARD-BAKER,<br><br>               Plaintiff,<br><br>    v.<br><br>CITY OF SEATTLE, et al.,<br><br>               Defendants. | CASE NO. C15-661 BJR<br><br>ORDER GRANTING MOTION<br>FOR SUMMARY JUDGMENT |

Before the Court is a motion for summary judgment by Defendants City of Seattle, John Diaz, Officer Matthew Chase and Officer Jeremy Pinkerton seeking dismissal of the remaining claims against them under 42 U.S.C. § 1983. Plaintiff stipulates to the dismissal of all claims against the City of Seattle, the Seattle Police Department[1], Michael Eastman, Jason Bender and John Diaz, but opposes the remainder of the motion.

---

[1] It appears from the record that the Seattle Police Department has previously been dismissed from this lawsuit. *See* Dkt. No. 70, Order Granting in Part and Denying in Part City Defendants' Motion to Dismiss at p. 9.

ORDER GRANTING MOTION FOR SUMMARY JUDGMENT - 1

1   Plaintiff's lawsuit against Defendants Chase and Pinkerton (members of the Seattle Police
2   Department; collectively "Defendants") concerns her allegations that the officers violated her
3   substantive due process rights under the U.S. Constitution by forcing her into a situation of known
4   danger and then failing to protect her.  Defendants deny her claims.

5   Having reviewed all the pleadings and attached declarations and exhibits, the applicable
6   case law and the relevant parts of the record, the Court does not find that oral argument would be
7   useful in further illuminating the issues and rules as follows:

8   IT IS ORDERED that Plaintiff's motion to dismiss her claims against Michael Eastman,
9   Jason Bender, John Diaz, and the City of Seattle is GRANTED.

10  IT IS FURTHER ORDERED that Defendants' motion for summary judgment of dismissal
11  of all remaining claims against them is GRANTED; the § 1983 claims against Defendants are
12  DISMISSED with prejudice.

13  The Court's reasoning follows.

## I.   Background

The following facts are not in dispute:

On the afternoon of January 28, 2010, Plaintiff and a friend came by bus into downtown Seattle and met up with some other friends at Westlake Center. (Dkt. No. 89, Decl. of Miller, Ex. A, Deposition of A. Steward-Baker ["Steward-Baker Depo"] at 9:18-23, 141:23-143:7, 146:24-148:11, 149:10-16.) Shortly after arriving there, one of Plaintiff's friends (Mark Skinner) got into a fight with Defendant Quashawn Monroe in a park on top of the Washington State Convention Center. (Steward-Baker Depo at 143:21-144:9.) Monroe and Plaintiff had a history of animosity and Plaintiff felt threatened by him. (*Id.* at 152:17-153:15) During the course of the fight on top

of the Convention Center, Monroe advanced on Plaintiff and she maced him. (*Id.* at 154:22-155:14.) Monroe became upset, yelled at Plaintiff and said he was going to kill her. (*Id.* at 164:5-13.)

At that point, Plaintiff and a group of her friends left the area, took a bus to the Central District and stayed at the Garfield Teen Life Center for one or two hours. (*Id.* at 160:25-161:16, 240:13-15.) Following that, the group took a bus back into downtown Seattle and returned to the Westlake Center area. (*Id.* at 167:6-18, 240:20-242:5.) They entered into the Macy's department store near Westlake Center and saw Monroe and a group of his friends exiting the store as they were entering. (*Id.* 167:13-168:23.) Monroe's group re-entered the store approximately two minutes later and Monroe again approached Plaintiff, who dodged between racks of clothes as he threatened again to kill her. (*Id.* at 168:24-170:10.)

Shortly after this confrontation began, Defendants (having seen a large group of juveniles run into the store) entered the building. (Dkt. No. 91, Decl. of Pinkerton ¶ 3, Ex. A ["Pinkerton Interview"] at 8-9; Dkt. No. 93, Decl. of Chase ¶ 3, Ex. A ("Chase Interview") at 5-6.) Entering the store, Defendants saw a verbal altercation between two groups of young people; one containing Plaintiff and her friends, the other Monroe and his friends. (Chase Interview at 5, Pinkerton Interview at 8-9.)[2] Plaintiff says the officers told Monroe's group to leave the store (Steward-Baker Depo at 170:20-172:16); the officers recall telling everyone to leave. (Chase Interview at 6, Pinkerton Interview at 9.) Monroe's group left before Plaintiff's, but before Plaintiff could leave, Monroe's group re-entered the store from the other side of the building. (Steward-Baker

---

[2] Although Plaintiff has no recollection of it (Steward-Baker Depo at 170:15-25), this was the second time that Defendants had contact with her that day. Earlier, she had approached Defendants and advised them that there was a group of juveniles who wanted to fight her; according to both of them, she was unable to give more than a vague description of the individuals in the group. She was advised at that time to leave the area and go home. (Chase Interview at 4-5, Pinkerton Interview at 4-8.)

Depo at 175:6-176:16.) Plaintiff went and stood by the police, and Defendants again told her to leave and go home. (*Id.* at 186:3-17.) As she was standing with Defendants, a young woman from Monroe's group named Destyni approached Plaintiff and wanted to fight her. Defendants made all of them leave the store. (*Id.* at 180:14-181:23.)

Monroe's group, after exiting Macy's, gathered outside of a McDonald's restaurant across the street. (*Id.* at 192:8-12.)[3] In order to get to her bus, Plaintiff needed to enter a bus tunnel which was also across the street from the McDonald's, on the "Macy's side" of the street. (*Id.* at 192:14-193:6) Between the time Plaintiff exited Macy's and the time she made her way to the bus tunnel, Plaintiff spoke with Defendants.[4] Plaintiff asked them if they would escort her to her bus stop. The officers declined to do so;[5] Plaintiff's recollection is that they told her "[t]hey don't have time to do that for kids starting trouble." (*Id.* at 193:11-20.)

Plaintiff entered the bus tunnel, intending to catch a bus home. (*Id.* at 199:17-20, 201:2-16.) Shortly afterwards, Monroe's group also appeared in the tunnel (*Id.* at 202:12-24) and a young woman in the group named Daysha approached her and assaulted her. (In addition to being part of a group antagonistic to Plaintiff on that particular day, Daysha and Plaintiff also had a "history" which included Plaintiff macing Daysha a few months prior, although the two had encountered each other in the interim without incident; *Id.* at 225:17-232:11.) Plaintiff ended up curled up on the ground as Daysha continued to attack her. (*Id.* at 203:18-205:5.) At the conclusion of the

---

[3] Later in her deposition, with her memory refreshed by testimony in an earlier statement, Plaintiff recalled that Defendants actually escorted Monroe's group over to the McDonald's. (Steward-Baker Depo at 268:15-269:2.)

[4] It is unclear from Plaintiff's testimony whether she spoke with Defendants before or after they escorted Monroe's group across the street; for purposes of the Court's analysis of the issues, it is immaterial in which order the events occurred.

[5] It is Defendants' uncontroverted testimony that they were the only two foot patrol officers in the area at that time (Chase Interview at 4), and that there were "a few more disturbances that night than usual" (Pinkerton Interview at 9); according to Officer Chase, there was a "high level of gang activity that night." (Chase Interview at 17.)

assault, property belonging to Plaintiff (including her cell phone) was taken.  (*Id.* at Ex. 6; Dkt. No. 53 at ¶ 8.)

Plaintiff had further contact with Defendants following the assault, but the Court finds the details of those interactions irrelevant to the issues as defined by Plaintiff's claims.

## II. Legal Standard

Summary judgment is appropriate if the evidence, when viewed in the light most favorable to the non-moving party, demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cnty of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).  The court is "required to view the facts and draw reasonable inferences in the light most favorable to the [non-moving] party." *Scott v. Harris*, 550 U.S. 372, 378 (2007).

The moving party bears the initial burden of showing there is no genuine issue of material fact and that he or she is entitled to prevail as a matter of law.  *Celotex*, 477 U.S. at 323.  If the moving party meets its burden, the burden shifts to the non-moving party to "make a showing sufficient to establish a genuine dispute of material fact regarding the existence of the essential elements of his case that he must prove at trial." *Galen*, 477 F.3d at 658.

## III. Discussion

### A. Motion to Strike

In their reply briefing, Defendants move the Court "to strike plaintiff's unsupported assertions in her response brief that plaintiff asked the officers to escort her into the tunnel and/or that the officers knew, prior to the assault, that plaintiff intended to go into the tunnel." (Dkt. No.

101, Reply Brief at 2.) Defendants are correct that this assertion is not supported by the deposition excerpts to which Plaintiff cites and that Plaintiff, in the latter part of her deposition, testified that she assumed that Defendants knew she was going into the bus tunnel (because her conversation with them took place in the tunnel entrance), but that the officers never directed her into the tunnel specifically. (Steward-Baker Depo at 439:10-440:2.)

As will be made clear in the discussion to follow, the Court finds this fact (or the absence of it) of questionable relevance, given that (1) Defendants' uncontroverted testimony is that they did not *order* Plaintiff to do anything and (2) there is no evidence that Defendants were aware that the bus tunnel was a potentially dangerous location. Defendants' motion will be granted insofar as the Court does not consider it an established fact that Defendants either knew Plaintiff had to enter the bus tunnel to catch a bus or ordered Plaintiff to enter the bus tunnel prior to her being assaulted.

### B. Motion for Summary Judgment

It is undisputed that the right to substantive due process creates no affirmative duty on the part of state agents to protect individuals from private third parties. *DeShaney v. Winnebago County Dep't of Soc. Svcs.*, 489 U.S. 189 (1989). An exception to this rule exists in the "state-created danger" doctrine, which permits recovery "when a state officer's conduct places a person in peril in deliberate indifference to their safety." *Penilla v. City of Huntington Park*, 115 F.3d 707, 709 (9th Cir. 1997). Qualifying a cause of action under this doctrine requires proof of two elements: (1) "affirmative conduct" that places a plaintiff in danger she would not otherwise have faced and (2) "deliberate indifference" to the danger thus created. *L.W. v. Grubbs*, 92 F.3d 894, 900 (9th Cir. 1996 ("*Grubbs II*").

1. *Affirmative conduct*

The test for "affirmative conduct" can be summed up simply: "[W]hether the officers left the person in a situation that was more dangerous than the one in which they found [her]." *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1071 (9th Cir. 2006).

The seminal case in "state-created danger" jurisprudence is *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989). A state trooper placed a drunk driver under arrest, ordered his female passenger out of the impounded car, then left the woman alone in an area known for a high crime rate. Trying to get home, the woman accepted a ride from a stranger and was subsequently abducted and raped. The Ninth Circuit held that the plaintiff had raised a genuine factual issue regarding whether the officer had, by his affirmative act, placed her in danger. *Id.* at 596. The test for "affirmative conduct" in this context has thus become: Did the state action "create[] or expose[] an individual to a danger which he or she would not have otherwise faced"? *Kennedy,* 439 F.3d at 1061.

Plaintiff asserts that the facts indicate this was indeed the case. Her argument concerning Defendants' "affirmative conduct" consists of the following:

> [T]he officers took affirmative conduct in directing [Plaintiff] to leave while expressing their lack of concern to deal with "troublemaking kids." They took these actions despite knowing of her predicament of having to enter the transit tunnel in order to comply with their directive and to a location where there was no immediate police protection.

Dkt 99, Response at 14.[6]

---

[6] While Plaintiff is correct that the evidence shows Defendants are aware that there is no Seattle Police Department presence in the Metro Transit tunnel, she has not proven (and is not entitled to an inference from the evidence produced) that Defendants thought there was no protection of any sort there. It is only clear from Defendant Pinkerton's testimony that he knew the Metro security guards (1) were not police officers and (2) did not have the authority to make arrests. (Dkt. No. 100-1, Decl. of Lavallee, Ex. A, Pinkerton Depo at 95:5-25.) There has been no evidentiary support provided for Plaintiff's representation that Defendants "knew the Transit tunnel security officers were there only to observe and report crimes and lacked the authority [to] physically protect passengers." (Response at 12.) Defendant Pinkerton's deposition testimony that "they were not of any help" clearly refers to the

1    The evidence establishes that Defendants (1) told Plaintiff (on more than one occasion) to
2 go home when she expressed concerns about her safety, while (2) refusing to escort her to a bus
3 stop.  Plaintiff cites to no evidence tending to prove that Defendants knew "of her predicament of
4 having to enter the transit tunnel."  However, even had Plaintiff established such proof, her claim
5 against Defendants would remain legally insufficient.

6    The "state-created danger" doctrine rests on proof that the state actors were responsible, by
7 their own actions, for "a danger which [Plaintiff] would not have otherwise faced."  It is clear to
8 the Court that *nothing* Defendants did either created or exposed Plaintiff to a danger she would not
9 otherwise have faced.  If she had done everything else she did that day, but never encountered
10 these officers during the course of events, she would have faced exactly the same threat that
11 eventually became an unfortunate reality for her.  Plaintiff cannot establish, on the record before
12 the Court, that anything Defendants did placed her in the path of a danger that was not already
13 present.  Without that proof, her circumstances do not qualify as a violation of her substantive
14 rights to due process.

15    The Court agrees with Defendants' position that what Plaintiff is actually complaining
16 about is the inaction on the part of the officers, not their actions.  Plaintiff's case is analogous to
17 that of the complaining parties in *Johnson v. City of Seattle*, 474 F.3d 634 (9th Cir. 2007), where
18 plaintiffs injured in a downtown Mardi Gras disturbance sought damages arising out of a decision
19 by the Seattle Police Department to refrain from entering an increasingly unruly crowd.  In
20 differentiating this situation from that of the plaintiff in *Wood*, the Ninth Circuit noted that the
21 police decision to hold back was not affirmative conduct under the "state-created danger" doctrine

---

Metro security officers not being of any help *to the police* in providing details of what happened to Plaintiff in the tunnel.

because it did not enhance the danger the Mardi Gras revelers had put themselves in by participating in the public celebration. This is a direct corollary to Plaintiff's situation here: in choosing not to escort her to her bus stop, Defendants did not enhance the dangerous situation which Plaintiff faced by her decision to remain in the downtown area (not to mention her decision to *return* to the downtown area after she had already been threatened with physical violence earlier that day).

>Plaintiff attempts to distinguish *Johnson* by arguing that
>
>the logic of the *Johnson* holding does not apply to all police patrol scenarios. If it did, no 'danger-creation' cases would be allowed to be brought against patrol officers for the reason that an injured party inevitably voluntarily places themselves in the position that leads to their damages.

Response at 17. Plaintiff's argument misses the point. While the rape victim in *Wood* chose to place herself in a car with a drunk driver (with the risks that choice entails), the fact that she found herself at the mercy of a rapist was the result of a situation which the police created by impounding the car and leaving her alone in a high-crime area. The police did not create the dangerous situation in which the celebrants in *Johnson* found themselves; they simply chose (based on a professional assessment of effectiveness) not to actively intervene in a crowd that had grown past their capacity to control. Defendants here did not create the dangerous situation in which Plaintiff found herself; they simply chose (based on a professional assessment of where their greater duty lay[7]) not to

---

[7] To quote Officer Chase: "Well, it's, we're not in a position, especially on that evening, to provide personal protection for an individual, you know. We didn't have the time and it's also not, isn't necessarily our responsibility to, to do that because of the other duties required of us. And that night, it really wasn't possible to facilitate that, given the number of people and the disturbances that were occurring in our area. You know, we were the only two foot beat officers in that area that night. To, to go down in the tunnel and wait for an indefinite period of time for somebody's bus to arrive would basically keep us off of our beat and away from, you know, possibly breaking up an actual crime that had been committed, or, you know, keeping the peace on that, on that area. So providing protection for a great number of people versus the one." Chase Interview at 9.

provide a personal escort for her. It is directly analogous to *Johnson* and dictates a similar result: there is no affirmative conduct upon which to build a "state-created danger" claim.

2. *Deliberate indifference*

At the outset, the Court notes that the analysis of Plaintiff's substantive due process cause of action could essentially conclude with the finding that she has failed to establish a genuine issue of material fact as regards affirmative conduct on the part of Defendants. The test for "state-created danger" is stated in the conjunctive and her inability to demonstrate affirmative conduct renders her § 1983 claim unsustainable.

In the interest of completeness, the Court will address the issue of whether Defendants acted with "deliberate indifference" toward Plaintiff. The Ninth Circuit standard for deliberate indifference calls for a defendant

> … to "act[] recklessly in conscious disregard" of a "substantial risk of serious, immediate and proximate harm." Such conduct occurs when the "defendant recognizes the unreasonable risk and actually intends to expose the plaintiff to such risks without regard to the consequences to the plaintiff."

*Grubbs II* at 899 (citation omitted). The court in *Grubbs II* went on to say that the "deliberate indifference standard… requires that the defendant have actual knowledge of, or willfully ignore, impending harm." *Id.* at 900.

Plaintiff attempts unsuccessfully to describe Defendants' conduct as satisfying this standard. She claims that the statement that the officers "[did] not have time for kids who started trouble" exhibits "deliberate indifference." But the "state-created danger" test is not concerned with "indifference" in the generic, non-legal sense of the term; rather, it requires "conscious disregard for a substantial risk of serious and impending harm." The "troublemaking kids" statement reveals none of the quality of conscious disregard for a substantial risk of serious and impending harm that the legal standard of "deliberate indifference" calls for. Up to the point

where Plaintiff requested an escort, all Defendants had seen was two groups of juveniles yelling at each other (and, by Plaintiff's account, a young woman inviting her to fight); all they heard from Plaintiff was her very general concern that one group of juveniles "wanted to fight her." This does not rise to the level of "substantial risk of serious and impending harm."

Plaintiff also points to Defendants' behavior towards her *after* she had been assaulted as evidence of their deliberate indifference. Setting aside for purposes of argument the fact that the parties' descriptions of this post-assault encounter differ significantly (e.g., neither Defendant recalled any obvious physical injuries on Plaintiff; Chase Interview at 11-12, Pinkerton Interview at 11-12), Defendants' conduct after the assault is not relevant to their state of mind prior to Plaintiff entering the tunnel and therefore not helpful in establishing Plaintiff's required proof.

If anything, the officers' conduct (escorting Monroe's group across the street, away from Plaintiff; urging Plaintiff to leave the area and go home) exhibits a level of concern for her well-being and an attempt to minimize the risk to her. In any event, the evidence produced by Plaintiff falls far short of establishing an intent to expose her to substantial risk of harm without regard to the consequences to her. There is insufficient proof of deliberate indifference here to satisfy the legal test for "state-created danger."

   3.  *Qualified immunity*

Defendants have requested a ruling that, should the Court be unpersuaded by their arguments for summary judgment on the merits, they are entitled to qualified immunity and dismissal on that basis. Having found that Defendants are entitled to summary judgment of dismissal of the remaining claims against them on substantive grounds, the Court declines to reach their qualified immunity argument.

## IV. Conclusion

While the Court is sympathetic to the premise underlying Plaintiff's complaint – that the duty of the police is to protect the citizenry from harm – the Court is equally sympathetic to the moment-to-moment decisions that beat officers constantly face regarding how to most effectively use their available time and deploy their limited resources. That weighing-and-balancing dynamic is embodied in the legal prohibition against the police *creating* circumstances where citizens are in more danger than they would have been had the police not intervened.

Plaintiff's remaining § 1983 claims against Defendants for violations of her right to substantive due process are dependent on her ability to establish that her damages arise from a "state-created danger" which is the result of the affirmative conduct of Defendants. Defendants have established, based on undisputed facts, that their conduct neither created nor exposed Plaintiff to a risk of harm which she would not otherwise have faced nor demonstrated deliberate indifference as that concept is understood in the Ninth Circuit. Plaintiff has been unable to produce evidence which raises a genuine issue of material fact as regards either of these elements.

The Court is uncertain of where this ruling leaves the ultimate disposition of this case. It appears that there are a number of "civilian" defendants who have never been served but also have never been formally dismissed. The parties are requested to respond on this issue.

Now therefore, it is ordered as follows:

1. The Court GRANTS summary judgment of dismissal of the remaining claims against Defendants Chase and Pinkerton, and those claims are ordered DISMISSED with prejudice.

2. Additionally, the Court GRANTS Plaintiff's request and DISMISSES her claims against Defendants John Diaz, Jason Bender, and the City of Seattle.

3. The parties are ordered to submit a joint status report to the Court within 7 days of the filing of this order indicating whether the dismissals reflected herein constitute the final resolution of this matter.

The clerk is ordered to provide copies of this order to all counsel.

Dated March 9, 2017.

_____
Barbara Jacobs Rothstein
U.S. District Court Judge